# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTRAL PENNSYLVANIA | : | CIVIL ACTION |
| TEAMSTERS PENSION FUND, et al., | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | NO. 07-CV-3554 |
| | : | |
| BEAR DISTRIBUTING COMPANY, | : | |
| INC., et al., | : | |
| Defendants | : | |

## M E M O R A N D U M

STENGEL, J._____March 26, 2009

The Central Pennsylvania Teamsters Pension Fund[1] and its Administrator, Joseph

J. Samolewicz,[2] bring this case against Bear Distributing Co., Inc., and Sheffer Beer

Distribution Co., Inc., pursuant to the Multiemployer Pension Plan Amendments Act of

1980 ("MPPAA"), 29 U.S.C. § 1381, *et seq*., a statutory amendment to ERISA.  In the

first count of the complaint, the plaintiffs allege a claim against Bear for failure to pay the

---

[1] Central Pennsylvania Teamsters Pension Fund is an "employee pension benefit plan" and a "multiemployer plan" within the meaning of Sections 3(2)(A) and 3(37) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002(2)(A) and 1002(37).  Central Pennsylvania Teamsters Pension Fund v. W & L Sales, Inc., 778 F. Supp. 820, 822 (E.D. Pa. 1991).  As such, it exists for the exclusive purpose of providing pension benefits to participants and beneficiaries in accordance with ERISA and Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5).

[2] As its Administrator, Mr. Samolewicz is a fiduciary of the Pension Fund within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21).  Mushalla v. Teamsters Local No. 863 Pension Fund, 300 F.3d 391, 396 (3d Cir. 2002).  The Trustees of the Pension Fund, who are appointed in equal numbers by management and labor, owe their exclusive fiduciary obligations to the Pension Fund's participants and beneficiaries.  See NLRB v. Amax Coal Co., 453 U.S. 322, 334 (1981).  The Fund, its Trustees, and agents must act in accordance with plan documents and applicable provisions of law.  29 U.S.C. § 1104(a)(1)(1).

withdrawal liability.  In Count II, the plaintiffs seek judgment against Sheffer Beer for failing to respond to the Pension Fund's request for information under Section 4219(a) of the MPPAA, 29 U.S.C. § 1399(a).  In Count III, the plaintiffs seek to hold Sheffer Beer jointly and severally liable for Bear's withdrawal liability because it continued Bear's business after Bear ceased operations.  The plaintiffs seek $18,229 in withdrawal liability, prejudgment interest, liquidated damages, attorney's fees, and costs.

The plaintiffs filed a motion for summary judgment to which the defendants have responded.  For the following reasons, I will grant the motion in its entirety.  I will also grant the plaintiffs' uncontested motion for sanctions.

## I. <u>BACKGROUND</u>

Mr. Clair E. "Sam" Sheffer and his family have been in the beer distribution business since 1956, when he opened Sheffer Beer.  <u>See</u> Clair Sheffer Dep. at 10.  Sheffer Beer has the territory rights for the distribution of certain brands of beer in York, Adams, Franklin, Fulton, and Lancaster Counties in Pennsylvania.  <u>Id.</u> at 11.  Sam Sheffer is the sole shareholder of Sheffer Beer.  <u>Id.</u> at 16.  He is also the sole shareholder of S.A.S., Inc., a leasing company which leases trucks, forklifts, and other equipment to Sheffer Beer.  <u>Id.</u>  While Clair Sheffer considers himself semi-retired and spends much of his time in Florida, Clint Sheffer, his son, runs the day-to-day operation at Sheffer Beer.

In 1976, Susan Sheffer-Renoll, Clair Sheffer's daughter, purchased Bear Distributing Company, Inc., an existing beer distributorship, and became a sub-distributor

of brewed beverages for Sheffer Beer in Lancaster County where it serviced about three

hundred customers.  Id. at 20, 29.  "The good graces of her grandfather helped her out

considerably" in the purchase of the company.  Id. at 22.  For the period July 1, 2001

through June 30, 2002, Bear posted $ 6.22 million in sales which represented about thirty-

two percent of Sheffer's total sales of $19.65 million for the same period.  See Gettys

Dep. at 28-29.

For many years, Local 771 represented all of Bear's employees except Ms.

Sheffer-Renoll.  See Sheffer-Renoll Dep. at 39.  The collective bargaining agreement

between Bear and Local 771 obligated Bear to make contribution payments to the Pension

Fund on behalf of the employees covered by the labor contract.  Id. at 90.  The final

collective bargaining agreement between Bear and Local 771 was in effect from February

1, 2001 through January 31, 2003.  Id. at 86.

On November 21, 2002, a fire destroyed Bear's offices and part of its warehouse.

Id. at 12, 14.  At the time of the fire, Bear had fifteen employees, including Ms.

Sheffer-Renoll, its sole owner and President.  Id. at 11-12, 39.  Bear also employed

warehouse workers, drivers, and clerical personnel.  Id. at 39.  The day of the fire, Ms.

Sheffer-Renoll told her employees that Bear would "temporarily discontinue operations."

Id. at 66-67.  Ms. Sheffer-Renoll was hired the following day by S.A.S., Inc., her father's

leasing company.  Id. at 7.  In addition to her work at S.A.S., Ms. Sheffer-Renoll provides

management services to Sheffer Beer and also serves as its Vice President of

Administration.  <u>See</u> Gettys Dep. at 7, 45.  Sheffer Beer pays thousands of dollars in management consulting fees to S.A.S.  <u>Id.</u>

Because in effect Bear's customers were Sheffer Beer's customers, it was imperative for Sheffer Beer that its customers continued to be serviced even after the fire. Accordingly, Clint Sheffer informed his sister that any Bear employee who wanted to work "temporarily" at Sheffer Beer, could report to Sheffer Beer the following day, fill out an application, and perform the same job.  Sheffer Beer hired twelve of Bear's fifteen employees.  <u>See</u> Clint Sheffer Dep. at 37.

Unlike Bear, Sheffer Beer is a non-union shop.  Its decision to hire Bear's employees after the fire created tension with Local 771.  On March 7, 2003, the Union filed an unfair labor practice charge with the National Labor Relations Board.  <u>See</u> Sheffer-Renoll Dep. at 74-75.  Local 771 also filed a grievance against Bear under the collective bargaining agreement seeking severance pay and benefits for its members.  <u>Id.</u> at 86.  When the grievance went to arbitration on November 17, 2003, Ms. Sheffer-Renoll had already decided not to resume operations at Bear.  <u>Id.</u> at 93.  Bear and Local 771 settled the grievance, with Bear agreeing, among other things, to: (1) pay the employees the difference in the hourly rate that they earned at Bear and the lesser amount that they earned per hour at Sheffer Beer for the period from November 22, 2002 through January 31, 2003; (2) pay severance to the employees; and (3) make contributions to the Pension Fund for the months of December 2002 and January 2003.  <u>Id.</u> at 88-92.  The Pension

Fund was not a party to the arbitration and did not participate in the settlement

discussions.  <u>See</u> Samolewicz Dep. at 10.  The resulting amount due the affected

employees totaled approximately $100,000.  <u>See</u> Sheffer-Renoll Dep. at 122.  Because

Bear did not have the cash on hand to pay the settlement, Mr. Clair Sheffer authorized

S.A.S. to extend a loan to Bear for that amount.  <u>Id.</u>  Ms. Sheffer-Renoll also made her

brother, Clint Sheffer, aware of the grievance and showed him the written settlement

agreement between Bear and the Union.  <u>Id.</u> at 92, 94-95.

## II. <u>LEGAL STANDARD</u>

Title 29 of the United States Code § 1132(e)(1) provides district courts with

exclusive jurisdiction over ERISA actions.  Section 4301(b) of the MPPAA, 29 U.S.C. §

1451(b), and Sections 502(e) and 515 of ERISA, 29 U.S.C. § 1132(e)(2) and § 1145,

provide jurisdiction over this action by the Pension Fund and its Administrator to recover

withdrawal liability from Bear and Sheffer Beer.

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  FED. R. CIV. P. 56(c).  An issue is "genuine" if the evidence is such

that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v.

Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might

affect the outcome of the case under governing law.  <u>Id.</u>

5

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. at 322.  Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its

opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363

(3d Cir. 1992).

## III.  DISCUSSION

Congress enacted ERISA to protect participants in employee benefit plans and

their beneficiaries.  29 U.S.C. § 1001(b).  The statute comprehensively regulates, among

other things, employee welfare benefit plans that, through the purchase of insurance or

otherwise, provide medical, surgical, or hospital care, or benefits in the event of sickness,

accident, disability, or death.  Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44 (1987).

The MPPAA amended ERISA, and was enacted "out of a concern that ERISA did

not adequately protect multiemployer pension plans from the adverse consequences that

result when individual employers terminate their participation or withdraw."  Supervalu,

Inc. v. Board of Trustees, et al., 500 F.3d 334, 336 (3d Cir. 2007) (citing Warner-Lambert

Co. v. United Retail & Wholesale Employee's Teamster Local No. 115 Pension Plan, 791

F.2d 283, 284 (3d Cir. 1986)).  The amendments to ERISA were designed to prevent

employers from withdrawing from a multiemployer pension plan without paying their

share of unfunded, vested benefit liability, thereby threatening the solvency of such plans.

Id. (citing Mfrs. Indus. Relations Ass'n v. E. Akron Casting Co., 58 F.3d 204, 205-06

(6th Cir. 1995)).  At the time the MPPAA was enacted, many employers were

withdrawing from multiemployer plans because they could avoid withdrawal liability if

the plan survived for five years after the date of their withdrawal.  Id. (citing Debreceni v.

Outlet Co., 784 F.2d 13, 15-16 (1st Cir. 1986)).

Congress recognized that multiemployer pension plans affected millions of Americans and found that "withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, its participants and beneficiaries, and labor-management relations."  29 U.S.C. § 1001a(a).

### A.  Count I

The plaintiffs argue that they are entitled to judgment in Count I for Bear's failure to pay the withdrawal liability.  I agree.  Congress intended for the MPPAA to uniformly impose withdrawal liability and to "'relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'"  Supervalu, Inc., 500 F.3d at 337 (citing Debreceni, 784 F.2d at 16).  To solve this problem, Section 4201 of the MPPAA requires that a withdrawing employer is liable for its share of the plan's unfunded vested benefits.  See Warner-Lambert, 791 F.2d at 284; see also 29 U.S.C. § 1381(a).  This insures that the financial burden will not be shifted to the remaining employers. Supervalu, Inc., 500 F.3d at 337.

It is the duty of the pension plan to determine whether withdrawal liability has occurred and in what amount.  29 U.S.C. §§ 1382, 1391.  Section 4211 of the MPPAA provides that the amount of an employer's withdrawal liability is the employer's

8

proportionate share of the unfunded vested benefits existing at the end of the plan year preceding the plan year in which the employer withdraws.  29 U.S.C. § 1391(b)(2)(A); see also Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 414-15 (1995); Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 216 (1986); Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 725 (1984). A complete withdrawal, as is the case here, occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan."  29 U.S.C. § 1383(a); see also Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund of Phila. and Vicinity, 787 F.2d 897, 899 (3d Cir. 1986).  The date of complete withdrawal is the date of the cessation of the obligation to contribute or the cessation of covered operations.  29 U.S.C. § 1383(e).  The obligation to contribute arises "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law."  29 U.S.C. § 1392(a).  Although "all covered operations" is not defined in the statute, the Third Circuit Court of Appeals has held that it means the "substantial cessation of normal business activity."  Crown Cork & Seal Co., Inc. v. Cent. States Se. & Sw. Area Pension Fund, 982 F.2d 857, 865-866 (3d Cir. 1992).  Here, there is no dispute that Bear has discontinued all normal business activity.

When an employer withdraws from a plan, the plan sponsor has a statutory duty to determine the amount of the withdrawal liability, to notify the employer of the

assessment, and to collect that amount from the employer.  29 U.S.C. § 1382.  The statute also provides that an employer that wishes to contest an assessment of withdrawal liability has an exclusive procedure for doing so.  The employer must resort to the mandatory arbitration process established by the statute.  Flying Tiger Line v. Teamsters Pension Fund of Phila. and Vicinity, 830 F.2d 1241, 1244 (3d Cir. 1987).  The first step that the employer must take to invoke this process is to file with the fund a request for review that raises objections to an assessment.  Failure to satisfy this obligation waives the employer's right to contest the assessment in any forum and subjects the employer to suit for the withdrawal liability.  IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 128-30 (3d Cir. 1986).

On March 15, 2005, the Pension Fund sent Bear a notice of withdrawal liability and a demand for payment under the authority of the MPPAA.  The correspondence, which was addressed to Ms. Sheffer-Renoll as Bear's President, informed the company that the Pension Fund had determined that Bear had effected a "complete withdrawal" in the 2003 plan year and that the company was being assessed $18,229 in withdrawal liability.  See Sheffer-Renoll Dep. at 103; Samolewicz Dep. at 12-14.  The notice also informed Bear of its right to request a review of the assessment within ninety days and its right to seek arbitration.  See Pl. Ex. A-15; see also Pl. Ex. E-1.  Although Ms. Sheffer-Renoll received the withdrawal liability notice, she took no further action on the Pension Fund's demand "under the advice of my attorney."  See Sheffer-Renoll Dep. at 103-104.

10

From March 31, 2004 until January 24, 2008, Ms. Sheffer-Renoll paid herself thousands of dollars in "bonuses" from Bear's checking account.  See Sheffer-Renoll Dep. at 143-144, 149, 152; see also Pl. Ex. A-25.

It is undisputed that Bear chose not to contest the fact of its liability or the calculated amount of liability.  It is further undisputed that Bear did not seek review by the Pension Fund or initiate arbitration on a timely basis as provided in 29 U.S.C. §§ 1399, 1401.  "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 4201 through 4219 [29 U.S.C. §§ 1381-1399] shall be resolved through arbitration."  29 U.S.C. § 1401(a)(1).  "If no arbitration proceeding has been initiated pursuant to subsection (a), the amounts demanded by the plan sponsor . . . shall be due and owing on the schedule set forth by the plan sponsor."  29 U.S.C. § 1401(b)(1); see also IUE AFL-CIO Pension Fund, 788 F.2d at 128-30 (an employer who has been assessed withdrawal liability and disagrees with the pension fund's determination regarding withdrawal liability must initiate arbitration review proceedings within the time limits set forth in the MPPAA).  When an employer ignores its arbitration rights, the MPPAA unambiguously provides that the liability is fixed and the employer's right to dispute the assessment is waived.  Id.  Although the Third Circuit has held that "under MPPAA there is no *per se* exhaustion requirement under which the court lacks jurisdiction to hear cases that have not first been before an arbitrator," Dorn's Transportation Inc. v. Teamsters Pension Trust Fund, 787 F.2d at 903,

it has also explicitly established that "where the issue of statutory interpretation 'involves

only an MPPAA section that Congress explicitly reserved for arbitration,' arbitration is

the appropriate route for resolution of the dispute." <u>Carl Colteryahn Dairy, Inc. v.</u>

<u>Western Pennsylvania Teamsters and Employers Pension Fund</u>, 847 F.2d 113, 123 (3d

Cir. 1988) (citing <u>Flying Tiger</u>, 830 F.2d at 1244)).

      Here, after Bear decided not to resume operations, the Pension Fund assessed the

company for the withdrawal liability, and sent the demand to Bear on March 15, 2005

consistent with its duty under the MPPAA.  The demand for payment came when Bear,

which has since closed its bank account, had sufficient funds to pay it.  In fact, Ms.

Sheffer-Renoll continued to pay herself thousands of dollars in "bonuses" from Bear's

account.  Ms. Sheffer-Renoll testified that she received the demand but neither paid it nor

took any further action than to forward it to her attorney.  Bear then ignored the demand,

failed to pay the withdrawal liability, did not request review by the Pension Fund, and did

not request arbitration.  Companies that fail to take any action in the face of a demand for

withdrawal liability face a certain default in the federal courts.  <u>See</u> <u>Teamsters Pension</u>

<u>Trust Fund of Phila. and Vicinity v. Domenic Cristinzio, Inc.</u>, 994 F. Supp. 617, 621

(E.D. Pa. 1998) ("When an employer ignores its arbitration rights, the MPPAA

unambiguously provides that the liability is fixed and the employer's right to dispute the

assessment is waived").

      I am not persuaded by Bear's argument that a settlement between Local 771 and

12

Bear operates as a bar to the Pension Fund's withdrawal liability claim.  The grievance had nothing to do with withdrawal liability or a claim that Sheffer Beer was Bear's successor in interest.  Under the settlement, the Union and Bear agreed that Bear would make the severance payments to its former employees but that, instead of making the health and welfare contributions for six months, Bear would make direct payments to the employees.  See Pl. Ex. A-11.  The Pension Fund was not a party to the arbitration and did not participate in the discussions which led to the settlement.  Mr. Samolewicz, the Administrator of the Pension Fund, testified that he was not involved in the grievance settlement between Bear and Local 771, and that he learned after the fact about the terms of the settlement.  See Samolewicz Dep. at 10-12.

Just as unpersuasive are the defendants' assumptions that the Pension Fund and Local 771 are the same entity, and that the Union had the authority to negotiate on behalf of the Pension Fund.  The Pension Fund and the Union are distinct entities.  See Central Pennsylvania Teamsters Pension Fund v. W & L Sales, Inc., 778 F. Supp. 820, 831 (E.D. Pa. 1991) (It is of no relevance that the union in the instant case did not object. Opinions of union officials are not binding. The pension fund is an entirely separate entity from the union and the company); see also McHugh v. Teamsters Pension Trust Fund of Philadelphia, 638 F. Supp. 1036, 1046 (E.D. Pa. 1986) (erroneous advice from a union official cannot be attributed to the trustees of an employee benefit plan); Zaucha v. Polar Water Co., 444 F. Supp. 602, 606 (W.D. Pa. 1978) (same); Lewis v. Harcliff Coal Co.,

237 F.Supp. 6, 7 (W.D. Pa. 1965) (same).

Accordingly, because Bear failed to file a request for review, the assessment is "due and owing." 29 U.S.C. § 1401(b)(1). Under these circumstances, I find that the Pension Fund is entitled to summary judgment in its favor on the claim against Bear for the withdrawal liability.

### B. Count II

The plaintiffs next argue that they are entitled to judgment in Count II against Sheffer Beer for its failure to respond to the Pension Fund's request for information under Section 4219(a) of the MPPAA, 29 U.S.C. § 1399(a).[3] I agree.

On June 22, 2007, the Pension Fund sought information from Sheffer Beer to determine the extent of the relationship between Sheffer Beer and Bear. See Clair Sheffer Dep. at 43-44. In its request for information, the Pension Fund advised Sheffer Beer that it was aware that Sheffer Beer had hired employees who previously worked at Bear and that Bear's telephone number was being answered "Sheffer Beer." See Pl. Ex. B-1. The Pension Fund also sought information about the ownership, customers, equipment, inventory, and other assets of the two companies. Id. On August 3, 2007, beyond the thirty-day time limit provided by the MPPAA, Sheffer Beer's counsel responded but did not provide the information requested by the Pension Fund. See Pl. Ex.

---

[3] Title 29 U.S.C. § 1399(a) provides: "An employer shall, within 30 days after a written request from the plan sponsor, furnish such information as the plan sponsor reasonably determines to be necessary to enable the plan sponsor to comply with the requirements of this part."

B-2.  Instead, counsel enclosed a copy of the NLRB's determination dismissing Local

771's unfair labor practice charge against Bear and Sheffer Beer, and a copy of the

grievance settlement agreement between Bear and Local 771.  Counsel stated, "the claims

made in your letter to Mr. Sheffer are covered by a copy of a settlement agreement

between the parties dated 11/17/03."  Id.  Counsel's reliance on the settlement agreement

is misplaced.  Neither the Pension Fund nor Sheffer Beer was a party to the grievance or

its settlement.

The Pension Fund sought information in an effort to determine the relationship

between Bear and Sheffer Beer, information it deemed necessary to be able to comply

with the requirements of the MPPAA.  Sheffer Beer did not provide that information.

The response Sheffer Beer attempted was untimely.  Accordingly, I will enter judgment

on behalf of the Pension Fund on Count II of the complaint.

### C.  Count III

The plaintiffs finally argue that they are entitled to judgment in Count III because

Sheffer Beer, as a successor company which assumed the business operations of Bear,

should be held liable for Bear's obligation to a multiemployer plan.  I agree.

Generally, at common law, "when one company sells or transfers all its assets to

another, the successor company does not embrace the liabilities of the predecessor simply

because it succeeded to the predecessor's assets."  Philadelphia Electric Co. v. Hercules,

Inc., 762 F.2d 303, 308 (3d Cir. 1985).  However, there are four exceptions to this general

15

rule of successor non-liability: (1) where the purchaser of assets expressly or impliedly assumes the liabilities of the transferor; (2) where the transaction amounts to a *de facto* merger; (3) where the purchasing corporation is merely a continuation of the transferor corporation; and (4) where the transaction is fraudulently intended to escape liability. Alcoa v. Beazer East, Inc., 124 F.3d 551, 565 (3d Cir. 1997).

Federal courts have expanded the scope of successor liability when necessary to protect important employment-related policies.  Beginning with cases under the National Labor Relations Act, federal courts have developed a federal common law successorship doctrine that now extends to nearly every employment law statute.  See Golden State Bottling Co. v. NLRB, 414 U.S. 168 (1973) (NLRA); Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323 (7th Cir. 1990) (ERISA); Secretary of Labor v. Mullins, 888 F. 2d 1448 (D.C. Cir. 1989) (Mine Safety and Health Act); Criswell v. Delta Air Lines, Inc., 868 F.2d 1093 (9th Cir. 1989) (Age Discrimination in Employment Act); Musikiwamba v. ESSI, Inc., 760 F.2d 740 (7th Cir. 1985) (42 U.S.C. § 1981); Bates v. Pacific Maritime Ass'n, 744 F.2d 705 (9th Cir. 1984) (Title VII of the Civil Rights Act of 1964).

In Golden State Bottling, the U.S. Supreme Court held that the purchaser of a business operation was liable for the seller's unlawful discharge of an employee.  The Court concluded that an employer who continues a predecessor's business operations with notice of an unfair labor practice charge is liable for the predecessor's actions.  414 U.S.

16

at 181-84.  The Court reasoned that the important federal labor policy of rendering whole

the victims of unfair labor practices trumped the common-law presumption against

successor liability.  Id.  A successor company therefore should not be permitted to

financially gain from the predecessor's business operation while avoiding liability for the

unfair labor practices embedded in that operation.

Courts have applied the Golden State rationale in ERISA cases.  In Upholsterers'

Int'l Union Pension Fund v. Artistic Furniture of Pontiac, the court held that an asset

purchaser could be liable for the delinquent contributions of its predecessor where the

purchaser: (1) continued the operations of the predecessor and (2) had notice of the claim.

920 F.2d at 1329.  The court justified its extension of the successorship doctrine because

of the financial implications that arise when an employer fails to make contribution

payments and/or payments of withdrawal liability to a defined benefit plan.  If a company

fails to make its required contributions, the employers who remain in the fund must make

up the difference to ensure worker benefits, unless the courts impose successor liability.

Id. at 1327-28.  In determining whether the successor company had continued the

business operation of the predecessor company, the court found the following facts

relevant:

> Artistic Furniture, the successor, employed substantially all of
> the predecessor's workforce;  Artistic Furniture operated from
> the same location; the successor used the predecessor's
> machinery and equipment and manufactured the same
> products; the successor completed work orders begun by the
> predecessor; the successor honored warranty claims for goods

17

> sold by the predecessor; and two corporate officers of the
> predecessor retained their positions with the successor.

Id.; see also Audit Services, Inc. v. Rolfson, 641 F.2d 757 (9th Cir. 1981) (the single most

important factor in the successorship analysis was the fact that the son's company had

hired substantially all of the employees of the father's predecessor company); Trustees for

Alaska Laborers-Construction Industry Health & Secur. Fund v. Ferrell, 812 F.2d 512,

515-16 (9th Cir. 1987) (company is a successor if it hires predecessor's workforce and

conducts essentially the same business).  The Third Circuit has cited Artistic Furniture

with approval when recognizing successor liability in the context of merging unions.  See

Teamsters Pension Trust Fund of Phila. & Vicinity v. Littlejohn, 155 F.3d 206, 208 (3d

Cir. 1996).

Here, there is ample evidence in the record to establish that Sheffer Beer is a

successor in interest to Bear, and thus liable for Bear's obligations to the Pension Fund.

The two companies are related entities though family ownership.  Sheffer Beer's sole

owner and President is Ms. Sheffer-Renoll's father.  Ms. Sheffer-Renoll's brother is the

Vice President of Sheffer Beer and has had day-to-day management responsibilities for

Sheffer Beer since 2001.  See Gettys Dep. at 7.  S.A.S., the family's third business, is a

leasing company that provided equipment solely to Bear and Sheffer Beer, including

delivery trucks, other vehicles, and forklifts.  See Sheffer-Renoll Dep. at 8, 34-35.

Sheffer Beer continued Bear's business operations.  It assumed the direct delivery

of product to Bear's three-hundred customers in Lancaster County.  The one-third of

18

Sheffer Beer's sales previously recorded by Bear were now recorded directly on Sheffer Beer's books.  When the fire destroyed Bear's facility, Sheffer Beer integrated Bear's operation into its own and reaped the resultant profits.  Sheffer Beer took over the month-to-month equipment lease that Bear had with S.A.S.  See Gettys Dep. at 54-55. Todd Gettys, Sheffer Beer's controller, testified, "Bear no longer needed equipment; it became available in S.A.S. fleet, so then, Sheffer Beer went to S.A.S. and leased the excess."  Id.  Sheffer Beer also repurchased from Bear nearly $70,000 in product that was not destroyed in the fire at Bear.

It also became necessary for Sheffer Beer to expand its facilities to accommodate the tremendous growth.  Without Bear's warehouse space in Lancaster County, Sheffer Beer was forced to reorganize its warehouse to accommodate the additional product necessary to service the routes obtained by taking over Bear's operations.  In 2006, Sheffer Beer completed an expansion which yielded a total of 80,000 square feet of warehouse space.

Sheffer Beer hired nearly all of Bear's employees who continued to perform the same duties that they had performed at Bear.  Mr. David Henry, a former Bear supervisor, continued in his supervisory role at Sheffer Beer.  Ms. Sheffer-Renoll was hired by S.A.S., the family's third company, and provides management consultation services to Sheffer Beer, which pays S.A.S. significant fees for those services.  Although she has no title at S.A.S., Ms. Sheffer-Renoll holds the title of Vice President of Administration at

Sheffer Beer.  All drivers hired by Sheffer Beer deliver product in Lancaster County, just as they did when they worked for Bear.  See Gettys Dep. 13.

There is also evidence in the record that Sheffer Beer's assumption of Bear's operations also included an assumption of its debt.  In September 2000, Ms. Sheffer-Renoll's mother lent Bear $201,695 to purchase inventory.  On May 7, 2004, after the sale of its facility, Bear repaid that loan.  By June 30, 2004, a loan for the same amount to finance Sheffer Beer's operation was entered on Sheffer Beer's books as a loan from the owner's wife, Ms. Sheffer-Renoll's mother.  Although the Pension Fund requested all documents related to these types of transactions, neither Bear nor Sheffer Beer produced such documents.

Ms. Sheffer-Renoll's roles at Bear and Sheffer Beer provided Sheffer Beer with notice of Bear's obligations to the Pension Fund.  Beginning the day after the fire, she has been providing management consultation services to Sheffer Beer under an arrangement with her father's company.  Her involvement in both companies is sufficient to satisfy the notice prong.  See Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Tasemkin, Inc., 53 F.3d 48, 49 (7th Cir. 1995) (the court observed that the son's active role in both old and new companies "may well satisfy the notice prong").

Sheffer Beer's notice of Bear's obligations to the Pension Fund can also be established through a loan Bear secured from S.A.S. to satisfy the settlement of the grievance filed by the Union.  Ms. Sheffer-Renoll's father authorized the loan.  Some of

20

that money was paid to the Pension Fund to satisfy the two months of contributions remaining in the collective bargaining agreement which ended in January 2003.  Ms. Sheffer-Renoll also testified that she informed her brother, the Vice President of Sheffer Beer, of the settlement obligation, and that she showed him the agreement.  Thus, the principals of Sheffer Beer knew of Bear's relationship with the Pension Fund and the potential of debt owed to the Fund by Bear.

Sheffer Beer cannot argue that the grievance settlement absolves it from liability as a successor in interest to Bear because the grievance was filed against Bear, not against Sheffer Beer.  The grievance sought payment of wages, severance, and benefit contributions under the terms of the collective bargaining agreement between Local 771 and Bear.  The grievance was limited to a dispute between the Union and Bear.  Sheffer Beer may not rely on the settlement of a matter in which it had no interest to escape liability as a successor in interest in this case.

Ms. Sheffer-Renoll's testimony regarding her reason for not resuming Bear's operation is also very telling in this context.  Ms. Sheffer-Renoll informed her employees that operations would temporarily cease following the fire.  During the following months, she was preparing to resume the company's operation.  Bear's facility was rebuilt, including its offices, warehouse, and cooler.  See Sheffer-Renoll Dep. at 45-46.  When asked why she decided not to resume operation, Ms. Sheffer-Renoll testified, "After – my father, Sam Sheffer, had gone to a national beer wholesalers convention and it was

21

indicated to him by representatives of Miller Brewing Company that they preferred everything coming out from one location." Id. at 47.  After this convention which took place in either October 2003 or November 2003, Ms. Sheffer-Renoll decided not to resume operation.  Id. at 49.  When questioned about this at his deposition, Clair Sheffer, Ms. Sheffer-Renoll's father, testified, "At the time Miller – we had everything under one roof. . . Miller wanted to stay that way. . . So [my daughter] sat over there with an empty building and we could not sell her beer again.  We couldn't renew the contract. . . [Miller] wanted it all a hundred percent consolidated now.  These other [subdistributors] that are still hanging out there, [Miller] wants them too."  See Clair Sheffer Dep. at 33.  It is apparent that Ms. Sheffer-Renoll's decision to cease Bear's operation was mostly influenced by her father whose company had integrated Bear's operation into its own and reaped the resulting profits.

Accordingly, I find that Sheffer Beer continued Bear's business operations, that it had notice of Bear's obligations to the Pension Fund, and that it is therefore jointly and severally liable for the unpaid withdrawal liability of Bear.  I will enter judgment on behalf of the Pension Fund in Count III.

### D.  Interest, Liquidated Damages, Attorney's Fees, and Costs

Under § 4301(b) of the MPPAA, 29 U.S.C. § 1451(b), an action to collect delinquent withdrawal liability is "treated in the same manner as a suit for delinquent contributions" under § 515 of ERISA, 29 U.S.C. §1145.  Accordingly, a plan that prevails

22

in a lawsuit for withdrawal liability must be awarded the withdrawal liability amount, interest on the unpaid amount, liquidated damages,[4] and attorney's fees and costs.  See 29 U.S.C. § 1132(g)(2),[5] made applicable to the MPPAA by 29 U.S.C. §§ 1451(b) and 1145; see also Penn Elastic Co. v. United Retail & Wholesale Employees Union Local 115 Joint Pension Plan, 792 F.2d 45, 48 (3d Cir. 1986).  The Third Circuit Court of Appeals has held that interest, liquidated damages, fees and costs are mandatory charges in withdrawal liability cases under ERISA.  Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d 161 (3d Cir. 1999); Huber v. Casablanca Indus., Inc., 916 F.2d 85, 101 n.34 (3d Cir. 1990).  The provisions for these damages were enacted because of Congress' concern over costs incurred by multiemployer plans, such as lost revenue and collection and litigation expenses, as a result of employer delinquencies.  Congress recognized that the cost to plans of employer delinquency detracted from the ability of plans to formulate or meet funding standards and adversely affected the financial health of plans.  Agathos v.

---

[4]  The amount of liquidated damages to be awarded is equal to the greater of:  (1) interest on the unpaid withdrawal liability or (2) liquidated damages provided under the plan.  See ERISA Section 502(g)(2)(C).

[5]  Section 502(g)(2) of ERISA provides:  In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section [515 of ERISA] in which judgment in favor of the plan is awarded, the court shall award the plan:  (A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A), (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and (E) such other legal or equitable relief as the court deems appropriate.  29 U.S.C. § 1132(g)(2).

Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992) (quoting 26 Cong. Rec. 23,039 (1980) (remarks of Rep. Thompson)).

Accordingly, I will schedule a hearing on this issue to give the plaintiffs an opportunity to present documents, testimony or other evidence in support of these claims. The defendants shall have the opportunity to show cause why these claims should not be awarded.

### E.  Pension Fund's Uncontested Motion for Sanctions

During discovery, I granted the Pension Fund's motion to compel the defendants to produce full and complete responses to interrogatories and requests for various documents.  The Pension Fund argues that the defendants needed constant prodding to comply with my Order, and in fact have still not complied fully.  Although ordered, the defendants never produced accounts receivable records, accounts payable records, bank records, and lease agreements.

The Federal Rules of Civil Procedure permit the court to impose sanctions when a party fails to comply with its Order to produce discovery.  Rule 37(b)(2)(C) requires an award of attorney's fees unless the disobedient party proffers substantial justification for its failure to ignore the court's directive.  The defendants chose not to respond to this motion for sanctions, and therefore have not proffered such justification.  Accordingly, I will grant the motion for sanctions, and will entertain recommendations at the hearing on the appropriate sanction under the circumstances.  An appropriate Order follows.

24

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CENTRAL PENNSYLVANIA** | : | **CIVIL ACTION** |
| **TEAMSTERS PENSION FUND, et al.,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **NO. 07-CV-3554** |
| | : | |
| **BEAR DISTRIBUTING COMPANY,** | : | |
| **INC., et al.,** | : | |
| **Defendants** | : | |

**O R D E R**

**AND NOW,** this   26th   day of March, 2009, upon consideration of the

plaintiffs' motion for summary judgment (Document #18), the defendants' response

thereto (Document #20), and the plaintiffs' reply (Document #24), it is hereby

ORDERED that the motion is GRANTED in its entirety.  Furthermore, upon

consideration of the plaintiffs' uncontested motion for sanctions (Document #17), it is

ORDERED that the motion is GRANTED.

IT IS FURTHER ORDERED that, consistent with this Memorandum and Order, a

hearing is scheduled for Monday, April 20, 2009 at 2:00 p.m., in the United States

Courthouse, 601 Market Street, Philadelphia, PA, Courtroom 3B.

BY THE COURT:

/s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.